## WILSON *v.* EDMONDS.

APPEAL FROM THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

No. 245. Argued April 11, 12, 1889. — Decided April 22, 1889.

On the facts of this case, it was held that the defendant was not a co-partner with another person, in his general business, and liable for his debts.

THE case is stated in the opinion of the court.

*Mr. Enoch Totten* and *Mr. W. Willoughby*, for appellant, cited: *Waugh* v. *Carver*, 2 H. Bl. 235; *Pleasants* v. *Fant*, 22

Wall. 116; *Parker* v. *Canfield*, 37 Connecticut, 250; *Pratt* v. *Langdon*, 12 Allen, 544; *Richardson* v. *Hughitt*, 76 N. Y. 55; *Cox* v. *Hickman*, 9 C. B. (N. S.) 747; *S. C.* 8 H. L. Cas. 268; *Bond* v. *Pittard*, 3 M. & W. 357; *Bullen* v. *Sharp*, L. R. 1 C. P. 86; *Perley* v. *Driver*, 5 Ch. D. 458; *Kitsham* v. *Jukes*, 1 B. & S. 868; *Beauregard* v. *Carr*, 91 U. S. 140; *Smith* v. *Knight*, 71 Illinois, 148; *Linton* v. *Millikin*, 47 Illinois, 178; *Curry* v. *Fowler*, 87 N. Y. 133; *Mifflin* v. *Smith*, 17 S. & R. 165; *In re Estate of Davis*, 5 Wharton, 530; *S. C.* 34 Am. Dec. 574; *Brooks* v. *Washington*, 8 Grattan, 268; *S. C.* 56 Am. Dec. 142; *South Carolina Bank* v. *Case*, 8 B. & C. 427; *Barton* v. *Hanson*, 2 Campb. 597; *Bank of the United States* v. *Binney*, 5 Mason, 176; *Wood* v. *Olmer*, 7 Ohio St. 172; *Leggett* v. *Hyde*, 58 N. Y. 272; *Everett* v. *Coe*, 5 Denio, 180; *Berthold* v. *Goldsmith*, 24 How. 536; *Hargrave* v. *Conroy*, 19 N. J. Eq. (4 C. E. Green) 281; *Sheridan* v. *Medara*, 10 N. J. Eq. (2 Stockton) 469; *S. C.* 64 Am. Dec. 464; *In re Francis*, 2 Sawyer, 286.

*Mr. Nathaniel Wilson*, for appellee, cited: *Brown* v. *Swann*, 10 Pet. 497; *Russell* v. *Clarke*, 7 Cranch, 69, 89; *Gregory* v. *Morris*, 96 U. S. 619, 623; *Hauselt* v. *Harrison*, 105 U. S. 401, 405; *Casey* v. *Cavaroc*, 96 U. S. 467, 480; *Clark* v. *Iselin*, 21 Wall. 360; *Peugh* v. *Davis*, 96 U. S. 332, 336, 337; *Russell* v. *Southard*, 12 How. 139, 147; *Hughes* v. *Edwards*, 9 Wheat. 489; *Babcock* v. *Wyman*, 19 How. 289; *Shillaber* v. *Robinson*, 97 U. S. 68; *Villa* v. *Rodriguez*, 12 Wall. 323; *Cook* v. *Tullis*, 18 Wall. 332; *Stewart* v. *Platt*, 101 U. S. 731, 738, 739; *Donaldson* v. *Farwell*, 93 U. S. 631; *Jerome* v. *McCarter*, 94 U. S. 734; *Yeatman* v. *Savings Institution*, 95 U. S. 764; *Seymour* v. *Freer*, 8 Wall. 202; *Beckwith* v. *Talbot*, 95 U. S. 289; *Dale* v. *Pierce*, 85 Penn. St. 474; *Curry* v. *Fowler*, 87 N. Y. 33; *Harvey* v. *Childs*, 28 Ohio St. 319; *Luitner* v. *Milliken*, 47 Illinois, 178; *Adams* v. *Funk*, 53 Illinois, 219; *Smith* v. *Knight*, 71 Illinois, 148; *Boston & Colorado Smelting Co.* v. *Smith*, 13 R. I. 27; *Williams* v. *Soutter*, 7 Iowa, 435, 445, 446; *Ruddick* v. *Otis*, 33 Iowa, 402; *Hart* v. *Kelley*, 83 Penn. St. 286, 290; *Wells* v. *Babcock*, 56 Mich. 276; *Beecher* v. *Bush*, 45 Mich. 188, 196; *Buzard* v. *Bank of*

*Greenville*, 67 Texas, 84; *Rice* v. *Austin*, 17 Mass. 197, 206; *Meehan* v. *Valentine*, 29 Fed. Rep. 276; *Barter* v. *Rodman*, 3 Pick. 434; *Denny* v. *Cabot*, 6 Met. 82; *Bradley* v. *White*, 10 Met. 303; *S. C.* 43 Am. Dec. 435; *Monroe* v. *Greenhoe*, 54 Mich. 9; *Thayer* v. *Augustine*, 55 Mich. 187; *Colwell* v. *Britton*, 59 Mich. 350; *Vanderburg* v. *Hull*, 20 Wend. 70; *Boyce* v. *Bundy*, 61 Indiana, 432; *Eastman* v. *Clark*, 53 N. H. 276; *Clifton* v. *Howard*, 89 Missouri, 192; *Cully* v. *Edwards*, 44 Arkansas, 423; *Polk* v. *Buchanan*, 5 Sneed, (37 Tennessee,) 721; *Dwinell* v. *Stone*, 30 Maine, 384; *Millett* v. *Holt*, 60 Maine, 169; *Darrow* v. *St. George*, 8 Colorado, 592; *Nicholas* v. *Thielges*, 50 Wisconsin, 491; *Pond* v. *Cummins*, 50 Connecticut, 372; *Setzer* v. *Beale*, 19 West Virginia, 274; *Crawford* v. *Austin*, 34 Maryland, 49; *Sangston* v. *Hack*, 52 Maryland, 173; *Heran* v. *Hall*, 1 B. Mon. 159; *S. C.* 35 Am. Dec. 178; *Cox* v. *Hickman*, 8 H. L. Cas. 268; *Bullen* v. *Sharp*, L. R. 1, C. P. 86; *Mollwo* v. *Court of Wards*, L. R. 4 P. C. 419; *Kilshaw* v. *Jukes*, 3 B. & S. 847; *Easterbrook* v. *Barber*, L. R. 6 C. P. 1; *London Assurance Co.* v. *Drennen*, 116 U. S. 461; *Drennen* v. *London Assurance Co.*, 113 U. S. 51.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

On the 7th of June, 1884, Josiah H. Squier, of the city of Washington, doing business there as a banker and broker, under the name of J. H. Squier & Co., being indebted in a large amount, made an assignment of all his property to Jay B. Smith, for the benefit of his creditors. Afterwards, in the same month, Theron C. Crawford, a creditor of J. H. Squier & Co., brought a suit in equity, in the Supreme Court of the District of Columbia, against Squier and Smith, to remove Smith from his position as assignee, and to have the estate settled. An order was made in that suit removing Smith and appointing Jesse B. Wilson receiver of the estate, for the purpose of administering its assets under the direction of the court. Squier died in September, 1884.

After the assignment to Smith and before the appointment of Wilson as receiver, James B. Edmonds filed in the Crawford suit a petition claiming that he was the owner of certain securi-

ties which were in a safe belonging to him in the office of the firm; and, by an order made in the cause, he was allowed to take possession of those securities, giving bond for the same. Thereupon Wilson, as receiver, filed a bill in equity, in the Supreme Court of the District of Columbia, against Edmonds. The bill alleged that Edmonds was not the owner of the securities; that he had been interested in business with Squier & Co. for a number of years; that the relations between Edmonds and Squier were defined by a written agreement, which in effect made Edmonds a partner with Squier in the business, down to the time of said assignment; that, in respect to two particular notes made by Squier & Co., and held by Edmonds, dated August 1, 1883, one for $40,000 and the other for $4000, Squier & Co. did not owe to Edmonds the moneys named in them; that, during all the time mentioned, Edmonds had been drawing out from the firm large sums of money, as interest upon moneys which he claimed to have advanced or paid to the firm; that such payments of interest had been largely in excess of that allowed by law, in many instances as great as $1\frac{1}{2}$ per cent per month; that such sums so paid as interest had been drawn from deposits made with Squier & Co. by persons who deposited their money with that firm and were still its creditors; and that Edmonds ought to refund the money so received by him as unlawful interest, if it should appear that he was not liable, as a partner with Squier, to pay all the debts of the firm.

The bill prayed that Edmonds might set forth in his answer when he first had any business relations with Squier, what they were, and how long they continued; that he might state what was the consideration for the two notes, and when it arose; and that he might set forth any written contract between him and Squier, in relation to any business transaction between them, and when and how he became possessed of the securities referred to, and the particulars of the payments of money by Squier & Co., or Squier, to him, both as principal and interest, and what moneys he had loaned or advanced to Squier & Co., for the purpose of buying or speculating in the purchase of vouchers of army or navy officers, and other securi-

ties, and the dates and amounts of all notes given to him by Squier & Co., and how much he had received in payment on said notes for principal, and how much for interest, and, if any such notes were given, when they were surrendered, and for what purpose and for what consideration.

The bill further prayed that the court would direct the said securities or their proceeds to be delivered or paid by Edmonds to the plaintiff, for the benefit of the creditors of Squier & Co., as having been the property of Squier & Co., which passed under said assignment; that, if it should appear that Edmonds was not a partner and as such liable to pay the debts of the firm, then a decree might be made against Edmonds for so much as had been paid to him by Squier & Co. as illegal interest upon money advanced or lent by him to Squier & Co.; and that an account might be taken between him and Squier & Co., to ascertain the true indebtedness, if any, of the firm to him.

The defendant put in an answer to the bill, claiming to be the owner of the securities in question, and stating that their total amount was about $28,443; that they consisted mostly of pay vouchers of United States officers, which by custom had become a sort of commercial paper, having a market value; that a few of them were indorsed payable to Squier & Co., but all of them had been delivered to the defendant by Squier & Co. for a valuable consideration equal to their par value, and upon the promise by Squier & Co. that they would redeem the same or collect the money thereon for the defendant, or do what might be necessary to enable him to receive the money thereon; that, since the order of the court allowing him to take them, he had found about $9000 of them to be of such doubtful value that he had, under an order of the court, tendered them to the receiver; and that of the residue (less than $20,000) some were of doubtful value. The answer denied that he had been interested in the business of Squier & Co. except as a creditor, and that he had ever been a partner in Squier & Co. or with Squier. He set forth his relations with Squier substantially as follows:

Early in April, 1879, Squier informed the defendant that the firm of J. H. Squier & Co., which was constituted of

Squier alone, was borrowing money and paying 2 per cent a month therefor, to enable it to purchase certain securities, and that it wished to borrow additional moneys for the purchase of official pay vouchers, and would pay interest on such money at the rate of from 1 to 1½ per cent a month. Squier offered to borrow moneys from the defendant at such rate, but the defendant declined to make such loans, and informed Squier that he had no knowledge of Squier's responsibility, and that 10 per cent per annum was the highest rate of interest he had ever paid or received. Subsequently, Squier came to him with some of the pay vouchers, and urged him to receive the same as security for money to be lent to Squier to enable him to purchase such vouchers, and proposed that, for the money so lent, the note of Squier & Co. should be given, and interest paid at the rate of 10 per cent per annum, payable at the end of each month, and half as much more, to be applied on the principal in final settlement. It was also proposed by Squier that the securities so obtained should be delivered to the defendant, and should be surrendered by him as they matured, on payment of the money they represented, or by having others of like kind and amount substituted for them, provided payments were so made before the maturity of the notes given for the money borrowed. The defendant agreed to this proposal, and, from April, 1879, to April, 1882, he lent to Squier & Co. nearly $48,000, taking notes for each separate loan at 10 per cent interest, and pay vouchers as security therefor. The loans were intended by the defendant to have amounted in the aggregate to only a small sum, but they finally aggregated a large sum, and, when he found that payments were not made as promised, he refused to make further loans, and took a memorandum to protect his title to the vouchers, and his right to collect them. For each loan made by him to Squier & Co., a separate note was so taken, and the various notes were subsequently consolidated into the two notes for $40,000 and $4000. Some time in 1882, there having been an extension given and a renewal of notes, and due credit given for all sums received from Squier & Co. to apply on the loans, both interest and principal, Squier & Co.

agreed to pay off the debt entirely, at a time not later than the early spring of 1883. This not having been done, the defendant, on August 1, 1883, demanded a settlement from Squier & Co., but, at the request of Squier & Co., consented to a further extension of six months as to $40,000 of the indebtedness, the defendant then holding the notes of Squier & Co. for $44,000, and pay vouchers as security therefor to about that amount. The interest on the notes had then been fully paid, and the debt had been slightly reduced by the monthly payments in excess of interest, made subsequently to April, 1882, the amount of which excess was less than $3000. Renewal notes were given for the same total amount as those surrendered by the defendant, leaving for further consideration what exact amount should be credited, with the agreement that, by means of such credit and payments of money, $4000 of the debt should be cancelled within three months. Squier & Co. agreed that while the notes were running they would keep the securities fully equal to the debt, and when unable to pay from the profits the stipulated monthly sum to apply on the notes, then any sums collected on the vouchers should not be reinvested nor others taken in lieu thereof, but should be applied on the debt, and that the securities of the defendant and any collections thereon should be kept free from other transactions of the firm. No portion of the notes was thereafter paid, except the monthly sum of $540 at the end of each month, before the failure of Squier & Co. Meantime, because of the reduction of the debt, though it was slight, the defendant allowed Squier & Co., in the exchange of securities, to reduce their aggregate. In so doing, he confided in Squier as to the quality and amount of the substituted securities, and, on the failure of Squier & Co., was surprised to find that the amount of securities held by him was less than had been represented and less than the aggregate debt, and that many of them which had been represented to be good were worthless.

This agreement, so made, and dated August 1, 1883, was evidenced by the following written instrument, executed by J. H. Squier & Co. and the defendant: "This agreement wit-

nesseth, that James B. Edmonds has delivered to J. H. Squier & Co. forty-four thousand dollars for investment by the latter for the former in the purchase of pay vouchers, payable not later than six months from date of purchase, of officers in army, navy, or civil service of the United States, and for re-investment, upon collection by said Squier, in same kind of securities, but not unless they are purchased so as to yield to said Edmonds a net profit of one and one-fourth per cent per month on forty thousand dollars and one per cent per month on four thousand dollars, and enough besides to pay said Squier & Co. for their services and for guaranteeing prompt payment of the vouchers. Said Squier & Co. guarantees the genuineness of each voucher he shall purchase, as well as its prompt payment and the return to said Edmonds of said principal sum of, forty-four thousand dollars over and above said profits, and may retain all profits above those going to said Edmonds as aforesaid. Said Squier & Co. shall transact all the business, without charge. Said Edmonds shall keep possession of the vouchers to the extent of the principal invested and two per cent besides, and will exchange, as they become payable, for others of like kind or for cash. He may keep his safe therefor in banking-house of said Squier free of charge. Said Squier & Co. give their notes to said Edmonds for said $44,000 and interest at ten per cent, to wit, one for forty thousand dollars and one for four thousand dollars, of same date as this memorandum, and as a further guaranty and indemnity to Edmonds. This contract shall terminate upon notice by either party or upon death of either, and then all the moneys so invested shall be returned to said Edmonds, with interest to extent aforesaid; and in case of death of said Edmonds the money shall be paid to his present wife, if she survive him. All moneys that may be collected by said Edmonds on said vouchers and received shall be credited to said Squier & Co. on said notes."

The total amount of the loans made by the defendant to Squier & Co. amounted to nearly $48,000, and the total amount of the moneys paid by Squier & Co., or Squier, to the defendant, in respect of such loans, for interest or principal, or for any other purpose, was less than $29,000. No sums were

drawn out of the firm by the defendant or received from it, except such payments to be applied first upon interest and the residue upon the principal. The defendant never put any money into the firm, or had any business transactions with it, except to make such loans, which were made to accommodate Squier & Co., and to enable them to purchase the vouchers, on condition that they should deliver them to the defendant as security for the loans. A note was given in every instance for the loan, bearing 10 per cent interest, which notes were surrendered to Squier & Co. whenever others were given in lieu thereof. The securities in question were delivered to the defendant from month to month, in lieu of others for the same or larger amounts surrendered to Squier & Co., it being usual for Squier & Co. to deliver a certain amount to him and to receive back others which had matured, of like or larger amounts; and occasionally the defendant entrusted small amounts to Squier & Co. for collection, upon the agreement to return a similar amount in a few days, to be purchased with the proceeds of the collection, according to the written agreement of August 1, 1883. A similar but briefer memorandum had been made in 1882 between the parties, which was given up with the old notes, to Squier & Co., on August 1, 1883. The total number of the notes given by Squier & Co. to the defendant was equal to the total number of the loans and renewals.

A replication was put in to this answer, and proofs were taken on both sides. The case was heard by the court at special term, before Mr. Justice Cox, and a decree made dismissing the bill. A copy of the opinion of the court is furnished to us, but it does not seem to be reported.

It appears from the opinion that the grounds on which the bill was dismissed were, that, although there may have been a partnership between the parties as to the particular venture or investment of the money in the securities in question, such a contract of partnership did not connect the defendant with the general business of Squier & Co.; that the contract was, that, in consideration of certain moneys placed by the defendant in the hands of Squier, he would purchase for the defendant a certain class of securities, which securities were not to be

mingled with the general business of Squier & Co., but were to be placed in the possession of the defendant and held by him; that no profits were to be received by the defendant except from this particular venture; that the property which the defendant's money was to buy was to be bought at a rate which would yield to the defendant a specified profit, and enough besides to pay Squier & Co. for their services and for guaranteeing prompt payment of the vouchers; that the property placed in the hands of the defendant was thus to be worth that much more than he paid for it, and his profit was to be derived from the identical securities which his money purchased; that the evidence showed that there was a large business done by Squier & Co. outside of the transactions with the defendant, in which business the defendant did not participate; that the parties connected with such other business had no concern with the transactions between the defendant and Squier & Co.; and that, although the relation between the defendant and Squier might be called a partnership relation to the limited extent mentioned, it was not of such a character as to involve the defendant in the responsibility with Squier claimed in the bill.

The plaintiff appealed to the court in general term, which affirmed the decree of the special term, and from that decree the plaintiff has appealed to this court. No opinion was rendered by the general term, and it may therefore be assumed that it proceeded upon the grounds stated by Mr. Justice Cox.

We are of opinion that, upon the same grounds, the decree must be affirmed. In addition, it may be said, that the evidence sustains the matters set up in the answer; that it is not shown that the defendant ever represented himself to be a member of the firm of Squier & Co., nor does it appear that any creditor of that firm was ever informed or supposed that the defendant was such member, or gave credit to the firm, or had dealings with the firm, on the understanding or belief that he was a partner. The dealings between the parties appear always to have been of the character mentioned in the written paper of August 1, 1883. In every case of an advance or loan of money by the defendant to Squier & Co., a note was given

to the defendant for the amount, bearing ten per cent interest, and pay-vouchers for the same amount were placed in the hands of the defendant. The money lent by the defendant to Squier & Co., for which the notes were given, was to be invested in vouchers which were to be bought at a rate to net in the way of discount the profit designated in the agreement; but that profit was not intended to be a profit to the defendant, in addition to the ten per cent interest, for it was expressly provided that all moneys which might be collected by the defendant on the vouchers, or received by him, should be credited to Squier & Co. on the notes. This compelled a credit to Squier & Co. on the principal of the notes, of all the monthly sums paid by Squier & Co. to the defendant, and called "profits," over and above the amount necessary to pay to him ten per cent interest on the aggregate amount of his loans; and the practical construction of the agreement by the parties was to the same effect, because the testimony of Edmonds shows that he had various settlements from time to time with Squier, in which prior notes that he had received from Squier for loans were surrendered to Squier, on the ground that they had been extinguished by the surplus of the monthly payments by Squier, over and above the amount necessary to pay to the defendant interest at ten per cent on the moneys which he had lent to Squier. It was lawful to stipulate in writing for interest at ten per cent. Rev. Stat. District of Columbia, § 714.

*Decree affirmed.*